UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

        -against-                                                              S1 05 Crim. 0888 (LAK)

JEFFREY STEIN, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Justin S. Weddle
> Assistant United States Attorney
> MICHAEL J. GARCIA
> UNITED STATES ATTORNEY
> *Attorneys for the United States*
>
> David Spears
> RICHARDS SPEARS KIBBE & ORBE LLP
> *Attorneys for Jeffrey Stein*
>
> Joseph V. DiBlasi
> ARKIN KAPLAN LLP
> *Attorneys for Jeffrey Eischeid*

LEWIS A. KAPLAN, *District Judge.*

        Nineteen tax advisors and lawyers formerly employed by or affiliated with the accounting firm KPMG stand indicted in what may be the biggest criminal tax fraud case in U.S. history. The indictment charges that the defendants designed, marketed and implemented fraudulent tax shelters for wealthy individual clients and deliberately concealed those tax shelters from the IRS. Defendant Stein, joined by defendant Eischeid, moves the Court for an order requiring the Government to identify specifically any *Brady* material contained in the electronic and paper

documents the government has made available to defendants. Their argument appears to be that the government cannot satisfy its *Brady* obligation simply by allowing the defendants to comb through the millions of page of documents it has produced, but must instead point defendants directly to any exculpatory material contained therein.

*Facts*

*A.     The Indictment*

The superseding indictment in this case, returned on October 17, 2005, charges that defendants conspired to create and implement four different fraudulent tax shelter vehicles – Foreign Leveraged Investment Program ("FLIP"), Offshore Portfolio Investment Strategy ("OPIS"), Bond Linked Issue Premium Structure ("BLIPS"), and Short Option Strategy ("SOS") – each of which was designed to generate phony tax losses for wealthy KMPG clients through a series of sham transactions. In furtherance of this conspiracy, defendants allegedly issued fraudulent opinion letters, which falsely represented that the tax shelters were likely to survive IRS review. The indictment charges also that the defendants conspired to conceal the fraudulent tax shelters from the IRS by, among other things, failing to register the shelters with the IRS, preparing tax returns that concealed the phony tax losses, and obstructing IRS and Senate investigations into the shelters.

*B.     The Government's Production*

The government has implemented an open-file discovery plan, providing defendants with its entire investigatory file. The core of the government's file is a series of electronic databases containing about five million pages of materials, which the government has made available to

defendants on three separate hard drives.[1] According to the government, the databases can be searched electronically by name, document, date, and other key words. The databases include documents from a variety of sources, including materials produced to the government by KPMG, Deutsche Bank, and a variety of other entities.[2]

Additionally, the government has made available to the defendants approximately 1,300 boxes of paper documents, which are currently located at a document storage facility in Maspeth, New York.[3] These boxes contain materials produced to the government by a variety of sources. By far the largest group of documents – comprising about 600 boxes – consists of files from the Small Business/Self Employed division of the IRS ("SBSE") relating to the SBSE's audits of 186 separate BLIPS transactions. The next largest group – about 300 boxes – contains the audit files of another IRS division, the Large and Medium Size Business group ("LMSB"), which audited a range of KPMG tax shelters. The government has provided defendants with indices identifying the source of each box and, for some of the larger sources, giving a further breakdown of that source's documents.[4]

---

[1] Tr., Oct. 17, 2005, at 7-8, 21-22.

[2] *Id.* at 7-11.

[3] *Id.* at 11.

[4] *Id.* at 11-17.

*Discussion*

In order to establish a *Brady* violation, "the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material."[5] "A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'"[6] The materiality question, moreover, cannot be decided in a vacuum. "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken *to put the whole case in such a different light as to undermine confidence in the verdict.*"[7]

In consequence, a court cannot decide in advance of trial that a *Brady* violation has occurred. Accordingly, a court would be hard-pressed to say, in advance of trial, that the government is obliged to produce certain material, or to identify specific items in its production as exculpatory, in order to comply with *Brady*. Judge Lake reached very much this conclusion in the *Enron* prosecution when he refused to order the government to identify exculpatory documents contained in its 80 million page open-file production.[8]

---

[5] *United States v. Ida,* 207 F. Supp.2d 171, 183 (S.D.N.Y. 2002).

[6] *Lamberti v. United States,* 22 F. Supp.2d 60, 66 (S.D.N.Y. 1998), *aff'd,* 201 F.3d 430 (1999) (table).

[7] *Kyles v. Whitley,* 514 U.S. 419, 435 (1995) (emphasis added).

[8] *United States v. Causey,* 356 F. Supp.2d 681, 695-96 (S.D. Tex. 2005).

Here, the government has produced a very large volume of material. The impact of the volume may be mitigated, at least in material degree, however, by the government's production of the core of its investigative file in the form of a computer-searchable database and by its creation of at least a rudimentary index to the Maspeth documents. This production was made available approximately eleven months before trial, and ten of those eleven months remain. Further, the government is likely to be required to identify the exhibits it will use on its case in chief well before trial. Given standard practice in this district, it is likely to produce Jencks Act material before the trial or, at least, in advance of the testimony of each witness.

In this context, it is impossible to say now that any failure by the government to specify documents that the government believes might be exculpatory (a specification which [i] might not accord with the defendants' assessment of the universe of documents, and [ii] could prove either over- or under-inclusive depending upon how the case and the trial unfold) would violate the *Brady* rights of any given defendant.

The cases defendants cite do not alter this conclusion. Even those decisions acknowledged that courts cannot determine in advance of trial whether exculpatory evidence is material and, therefore, cannot determine whether the government has violated *Brady*.[9]

This is not to say that the government is free to proceed on the assumption that its open-file policy utterly protects it from any *Brady* issue involving the material it has produced. It may well be that the production of the searchable data bases and of the rough index to the Maspeth

---

[9] *United States v. McVeigh,* 954 F.Supp. 1441, 1450 (D. Col. 1997) ("[I]t is not possible to apply the materiality standard in *Kyles* before the outcome of the trial is known."); *United States v. Hsia,* 24 F.Supp.2d 14, 30 (D.D.C. 1998) (noting that before trial, "it is not the court's role to referee . . . disagreements about materiality and supervise the exchange of information") (internal quotations omitted).

documents, coupled with the length of time before trial and the other factors discussed above, would defeat any collateral attack based on material in the government's production on the ground that any such exculpatory evidence was reasonably available to the defendants. But it is not certain to do so. In consequence, judgments must be made about the extent to which the government should try to avoid such a contingency by combing the materials itself and flagging items of possible interest for the defense. Those are judgments for the government, not, in advance of trial, for the court.

*Conclusion*

The motion of defendants Stein and Eischeid for an order requiring the government to identify *Brady* material contained within its production is denied.

SO ORDERED.

Dated: November 14, 2005

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)