UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

      -against-                                      S1 05 Crim. 0888 (LAK)

JEFFREY STEIN, et al.,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

    James R. DeVita
    BRYAN CAVE LLP

    John A. Townsend
    TOWNSEND & JONES LLP

    *Attorneys for Defendant Carol Warley*

    John M. Hillebrecht
    Justin S. Weddle
    Kevin M. Downing
    Stanley J. Okula, Jr.
    Margaret Garnett
    Assistant United States Attorneys
    MICHAEL J. GARCIA
    UNITED STATES ATTORNEY

LEWIS A. KAPLAN, *District Judge.*

        Defendant Carol Warley was a partner in KPMG LLP ("KPMG"), one of the world's largest accounting firms. She was questioned in the course of an IRS investigation by attorneys hired by KPMG. When that investigation gave way to a threatened indictment of KPMG, the firm, in an

effort to curry favor with prosecutors and avoid prosecution, waived its attorney-client privilege and gave the government documents embodying the substance of the attorneys' communications with Ms. Warley. Warley contends that the attorneys were representing her as well as KPMG, that her attorney-client privilege was compromised by the actions of the government and KPMG, and that the evidence should be suppressed. She thus raises a troublesome question that arises whenever an employee[1] of a business organization consults with counsel retained by the entity about matters involving both the employee and the entity – when does the lawyer represent the employee as well as the entity?

This problem could be avoided if counsel in these situations routinely made clear to employees that they represent the employer alone and that the employee has no attorney-client privilege with respect to his or her communications with employer-retained counsel. Indeed, the Second Circuit advised that they do so years before the communications here in question.[2] But there is no evidence that the attorneys who spoke to Ms. Warley followed that course.

*Facts*

Ms. Warley was a partner of KPMG at all relevant times. In 2003, the IRS was investigating KPMG's tax shelter activities, including some in which clients of Warley had participated. In the course of the investigation, Warley communicated with KPMG's in-house counsel and with two law firms retained by KPMG, Kronish Lieb Weiner & Hellman LLP

---

[1] "Employee" is used as a matter of convenience to refer to partners and employees except where the context otherwise requires.

[2] *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 217 (2d Cir. 1997).

3

("Kronish") and King & Spalding LLP ("King & Spalding"). Warley does not recall having been told that the attorneys represented only KPMG or that any privilege belonged solely to the firm and could be waived by the firm without her consent.[3]

In September 2004, in circumstances that have been discussed elsewhere,[4] KPMG waived its attorney-client privilege for communications relating to the IRS summons.[5] It gave the government documents relating to these communications, and the government apparently intends to use them in prosecuting Warley and others. The government argues that KPMG's waiver was sufficient to allow it to obtain the documents and disputes Warley's claim of privilege.[6]

Warley identifies two sets of allegedly privileged communications relating to which the government has documents.[7] First, Warley was interviewed by attorneys from Kronish and King & Spalding on two occasions in August 2003. The government is in possession of a memorandum of these interviews prepared by a Kronish attorney as well as his handwritten notes. In addition, it has listed as a trial witness one of the Kronish attorneys present at these interviews.

The second allegedly privileged communication is an email exchange in January and

---

[3] Warley Decl. ¶ 5.

[4] *See United States v. Stein*, 435 F.Supp.2d 330 (S.D.N.Y. 2006).

[5] Gov't Mem. 3.

[6] The government argues in the alternative that Warley has waived any privilege or that the crime-fraud exception applies. Since the Court finds no privilege, it need not address these arguments.

[7] Warley asserts that there may be other privileged communications in the government's possession of which she is not aware. DeVita Decl. ¶ 8.

4

February of 2003 between Warley and Steven Gremminger, an in-house attorney for KPMG, relating to the tax strategies under investigation. The government has a copy of this email string.

Both parties point to the substance of the communications to support their respective claims that privilege did or did not attach. Warley further relies upon KPMG's 2003 partnership agreement, which provided that "[t]he General Counsel shall act on behalf of all Members, except where a dispute arises between an individual Member and the Firm."[8] Finally, Warley alleges that counsel retained by KPMG jointly represented KPMG and her personally in two lawsuits prior to the events at issue here.[9]

*Discussion*

A.   Scope of Privilege

The question whether employee communications with counsel retained by the employer about matters relating to the employment are privileged *vis-a-vis* the employee – in other words, whether the employee has a personal attorney-client privilege that only the employee may waive – is troublesome because competing interests are at play.

---

[8] DeVita Decl., Ex. E, ¶ 3.6.

[9] Warley makes much also of a subsequent joint representation of her and KPMG by King & Spalding in a civil suit that involved the tax strategies at issue in the IRS investigation in which she and KPMG, among others, were named defendants. Since that joint representation occurred after the communications at issue here and thus could not have any bearing on whether an individual attorney-client relationship existed at the time of these communications, it is not relevant. Similarly irrelevant are statements made by counsel for Warley and KPMG well after the fact, particularly considering their ambiguous nature. Finally, both parties point to possessive language such as "*our* outside counsel" or "KPMG has retained [attorneys] to help *it*" in contemporaneous emails from KPMG senior management and in-house counsel. These statements are neither clear nor dispositive of the issue at hand.

On the one hand, an employee, like any other agent, owes the employer a duty to disclose to the employer any information pertinent to the employment.[10] This includes an obligation "to assist [the] employer's counsel in the investigation and defense of matters pertaining to the employer's business."[11] Moreover, an employer has a substantial interest in retaining freedom of action to respond to investigations and other legal threats, an interest borne of the desire to remain in business and of duties to other constituents of the entity. Allowing individual employees to assert personal attorney-client privilege over communications with the employer's counsel could frustrate an employer's ability to act in its own self interest, perhaps to the detriment of other employees, stockholders, or partners.[12]

Nevertheless, there are weighty considerations on the other side of the scale. Once a government investigation begins, the interests of employees and of the entity may diverge. Indeed, that may be true in other circumstances in which employees communicate with employer counsel.

---

[10] See RESTATEMENT (THIRD) OF AGENCY § 8.11 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . . the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal . . . .").

Both parties agree that the communications at issue here involved matters pertinent to KPMG's affairs. Where the substance of the communication involves only personal concerns of the employee, with no impact on the employer, the analysis of the competing interests would likely change.

[11] In re Grand Jury Subpoena, 274 F.3d 563, 571 (1st Cir. 2001).

The fact that KPMG is a partnership and that Warley was a partner does not alter this analysis, as partners owe similar duties. See, e.g., Meinhard v. Salmon, 249 N.Y. 458, 463-64, 164 N.E. 545, 546 (1928) (Cardozo, J.).

[12] See Teamsters, 119 F.3d at 216 n.2 (rejecting reasonable belief standard for individual privilege because it "would provide employees seeking to frustrate internal investigations with an exceedingly powerful weapon").

Employees often are unaware of the potential personal consequences of cooperating with lawyers hired by their employers. Even more troublesome, they may cooperate with employer-retained counsel in the belief that their communications are protected by a personal privilege, sometimes as a result of a misapprehension of the law and occasionally perhaps as a result of deception, inadvertent or otherwise.

Courts have wrestled with this problem for some time now. In the absence of evidence that the employee was deceived by the employer as to the existence of a personal attorney-client relationship or as to a personal right to control the disclosure of privileged materials,[13] circuits

---

[13] Where such evidence exists, it may be appropriate to make the employer bear the burden of the employee's erroneous understanding.

An employer often has an interest in giving an employee the impression that communications between an employee and an employer-retained attorney are privileged. Such impressions, whether products of express or implicit assurances, encourage full and frank disclosure, which may be in the employer's interest. Hence, employees on occasion may be told or, perhaps more often, allowed to believe that employer-retained counsel act on their behalf as well as for the employer. But employers, regulators and prosecutors have no legitimate interest in benefitting from information disclosed by employees to employer-retained counsel as a result of deception attributable to employers. (Although, as noted above, employees may be obliged to disclose such information to their employers, an employee quite rationally might reject an employer's demand for information and suffer the consequences in preference to making disclosures that could result in criminal charges against or other severe adverse consequences to the employee.) Of course, if counsel always followed the Second Circuit's admonition to make full and accurate disclosure to employees as to the ownership of any privilege that may attach to communications, the situation never would arise. Thus, if the employee has been misled by the employer, it may be appropriate to treat the communication as protected by the employee's personal privilege regardless of its pertinence to the employer's business.

In contrast, in some cases an employee may believe that his or her statements to employer-retained counsel are privileged because the employee has picked up incomplete or erroneous information, completely independent of the employer. People act on erroneous information all the time. Their employers have no duty to ensure that all of their decisions are fully informed and well advised. In consequence, employees who talk to employer-retained counsel in the belief that their statements are privileged as to them personally, without having been led to that belief by the employer or its counsel, have only themselves

have employed different standards to determine when personal privilege attaches. Some have looked at whether the individual reasonably believed that there was a personal attorney-client relationship,[14] although the Second Circuit has rejected this approach.[15] Others have focused on whether the individual expressly requested personal advice or representation.[16] In *In re Bevill, Bresler & Schulman Asset Management Corp.*, the Third Circuit enunciated a five-part test that has been adopted by at least two other circuits:

> "First, [the individual claiming personal privilege] must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company."[17]

Our circuit addressed the issue in *United States v. International Brotherhood of Teamsters*.[18] The *Teamsters* court first noted that courts typically have said that the attorney-client

---

to blame and must take the consequences.

[14] *See In re Grand Jury Subpoena*, 415 F.3d 333, 339-40 & n.4 (4th Cir. 2005).

[15] *Teamsters*, 119 F.3d at 216-17.

[16] *See Ross v. City of Memphis*, 423 F.3d 596, 605 (6th Cir. 2005); *In re Grand Jury Subpoena*, 68 F.3d 480, 1995 WL 608481, at *2 (9th Cir. 1995).

[17] 805 F.2d 120, 123, 125 (3d Cir. 1986) (citing district court) (first alteration added). *See also In re Grand Jury Proceedings*, 156 F.3d 1038, 1040-41 (10th Cir. 1998); *In re Grand Jury Subpoena*, 274 F.3d at 571-72.

[18] 119 F.3d 210.

privilege for an employee's communication with corporate counsel about corporate matters belongs to the corporation, not the individual employee. Nevertheless, it said, courts have found a personal privilege where the individual met "certain requirements."[19] It quoted the Third Circuit's *Bevill* test as one such example and noted that other courts have required the employee "make it clear to corporate counsel that he seeks legal advice on personal matters."[20] Drawing upon all of these sources, the Circuit concluded that the individual before it lacked any personal privilege with respect to the communications at issue because he "neither sought nor received legal advice from [his employer's counsel] on personal matters."[21]

*Teamsters*' holding thus rests on the scope of "personal matters."[22] But the meaning

---

[19] *Id.* at 215.

[20] *Id.*

[21] *Id.* at 216.

Although the government urges the Court to apply the *Bevill* test in this case, *Teamsters* did not adopt *Bevill* as its holding. Further, while *Bevill* has much to commend it, it contains elements that are unpersuasive. For example, *Bevill*'s first factor requires the individual to approach counsel in search of legal advice. But, as Warley correctly notes, "[i]n the real world, it is often the entity and its in house attorneys who first learn of the need for representation of the firm and its partners." Warley Reply 7.

[22] A footnote in *Teamsters* stated that "[t]he terms 'corporate' and 'corporation' are used for ease of reference to refer to any entity that employs its own counsel to represent its interests, even though not all such entities are in fact corporations." *Teamsters*, 119 F.3d at 214 n.1. The government urges that *Teamsters* therefore is controlling here notwithstanding that KPMG is a limited liability partnership and that the entity involved in *Teamsters* was not. Given the difference in the nature of the entities involved, *Teamsters* is binding here and in other cases involving entities different from that involved in that case only to the extent that there is no material difference between the entities involved in the cases.

The question whether *Teamsters* applies in a partnership case is not entirely clear and, indeed, may not admit of a general answer. For one thing, members of a general partnership are jointly and severally liable for obligations of the partnership and thus have a far greater

of that phrase has not been developed. Do "personal matters" involve solely the individual, with no impact on the entity's interests whatsoever? Or may they encompass matters that implicate both the individual and the entity? Although the facts of *Teamsters* suggest that the Circuit might have contemplated the former view, it did not expressly address the question.

Some guidance may be gained from circuits that have addressed this issue in the context of the fifth *Bevill* factor, which requires that the communication "not concern matters within the company or the general affairs of the company."[23] The Tenth Circuit concluded that this factor

> "only precludes an officer from asserting an individual attorney client privilege when the communication concerns the *corporation's* rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the *individual officer's* personal rights and liabilities, then the fifth prong of [*Bevill*] can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company. For example, a corporate officer's discussion with his corporation's counsel may still be protected by a personal, individual attorney-client privilege when the conversation specifically concerns the officer's personal liability for jail time based on conduct

---

personal stake in the representation of the entity, if in fact the partnership is an entity to begin with, than does an employee of a corporation. For another, partnerships frequently are not legal entities. *See, e.g., Williams v. Hartshorn*, 296 N.Y. 49, 51, 69 N.E.2d 557, 559 (1946) (partnership not a legal entity under New York law); *Sugarman v. Glaser*, 62 Misc. 2d 1037, 1039, 310 N.Y.S.2d 591, 593 (Sup. Ct. Bronx Co. 1970) (CPLR § 1025, which allows partnership to sue and be sued in its own name, does not alter fact that partnership is not a legal entity for substantive purposes). In such instances, counsel to the partnership in reality represents the individual partners. Finally, there is a vast difference, quite possibly pertinent to the attorney-client privilege issue, between a large partnership in which the majority of partners has little or no role in the management of partnership affairs and a much smaller partnership in which every partner is heavily involved in all partnership affairs. Suffice it to say for present purposes, however, that Warley has not sustained her burden of demonstrating that the circumstances of her partnership support treating her as anything other than an employee for purposes of the privilege. KPMG is a limited liability partnership with over one thousand partners who probably are not exposed to unlimited liability for partnership obligations. *See* 6 DEL. CODE ANN. § 15-306(c). Under Delaware law, moreover, the firm is an entity distinct from its members. *Id.* § 15-201(a).

[23] *Bevill*, 805 F.2d at 123.

interrelated with corporate affairs."[24]

The First Circuit adopted the Tenth Circuit's interpretation and discussed its application where communications involving the individual's liabilities "do not appear to be distinguishable" from those concerning the entity's interests.[25] Acknowledging that both the employee and the entity could have an attorney-client relationship with the attorney with respect to such a communication, but noting also the fiduciary duty owed by a corporate officer to the corporation, the First Circuit concluded that "a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel."[26] Thus, under the First Circuit formulation, individual privilege may be asserted successfully only when "communications regarding individual acts and liabilities are segregable from discussions about the corporation."[27] To hold otherwise, the court reasoned, "would open the door to a claim of jointly held privilege in virtually every corporate communication with counsel."[28]

The Tenth and First Circuits thus have argued persuasively that communications

---

[24] *In re Grand Jury Proceedings*, 156 F.3d at 1041.

[25] *In re Grand Jury Subpoena*, 274 F.3d at 572.

[26] *Id.* at 573. It is not clear how the First Circuit would rule in an analogous case involving an employee who was not an officer or director.

[27] *Id.*

[28] *Id.*

implicating personal liability for acts within the scope of an individual's employment[29] may be protected by individual attorney-client privilege, at least in some circumstances. It is an open question whether such communications involve "personal matters" within the meaning of *Teamsters*. But it is unnecessary to resolve that issue here. As discussed below, and particularly in light of the fact that the burden of proof lies with the party asserting privilege,[30] Warley fails to meet any standard.

B.  *Warley's Claims*

To begin with, there is no evidence that Warley was deceived by KPMG or its attorneys about the nature of her relationship with counsel. Although she claims to have "understood that . . . [counsel] were representing [her] personally as a partner in the firm,"[31] her subjective belief alone does not support a conclusion that KPMG's acts were responsible for that belief. Accordingly, the analysis of her claims rests on whether the communications involved "personal matters."

Warley's communications with counsel were about events and conduct within the scope of her work as a partner at KPMG,[32] thus clearly implicating KPMG's interest in responding

---

[29] For reasons previously discussed, the Court assumes that communications made to employer-retained counsel by an employee who was misled into believing that the communications were subject to a personal privilege might well be regarded as subject to a personal attorney-client privilege.

[30] *Teamsters*, 119 F.3d at 214; *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989).

[31] Warley Decl. ¶ 3.

[32] The Court has reviewed the memorandum of the August 2003 interviews, which was submitted under seal. The full email string between Warley and Gremminger was attached

to the IRS investigation.  The events and conduct, however, also implicated Warley's personal interests and liabilities, as is amply evidenced by her status as a defendant in this case.  Warley's communications thus present the difficult circumstance where both the individual's and the entity's interests are involved.

As discussed above, the scope of "personal matters" under *Teamsters* is unclear.  Under a narrow reading, the fact that the communications implicated KPMG's interests alone would require that Warley's claim of privilege be rejected.  Even under the approach adopted by the First and Tenth Circuits, however, Warley could not prevail on a privilege claim absent a showing that communications implicated her interests alone and were segregable from those involving KPMG's interests.  Nothing in the allegedly privileged documents or the affidavits submitted with this motion indicates that the communications focused on her personal interests alone.  The Court therefore need not determine the parameters of "personal matters," as Warley's disclosures would not come within even a broad view of the term.

Warley nevertheless argues that her communications were privileged *vis-a-vis* herself because (1) the KPMG partnership agreement provides that "[t]he General Counsel shall act on behalf of all Members, except where a dispute arises between an individual Member and the Firm," and (2) counsel retained by KPMG represented both Warley and the firm in litigation on two occasions prior to the communications here at issue.  But these contentions are not persuasive.

To begin with, the occasions on which Warley and KPMG were jointly represented occurred in circumstances in which Warley was a witness, not a party, to the litigation.  The Court is not persuaded that representation of an employee by employer-retained counsel where the

---

as an exhibit to Warley's moving papers.

13

employee's role is that of a witness in a lawsuit against the employer could give rise to a reasonable expectation on the part of the employee that all communications she might have with employer-retained counsel, even a long time thereafter, were made in the context of an individual attorney-client relationship.

Nor has Warley offered any evidence that she in fact subjectively relied either upon the language in the partnership agreement or the previous litigation experience in concluding that Kronish, King & Spalding, or Gremminger was representing her individually.[33]

*Conclusion*

In the end, Warley's showings amount merely to a claim of her subjective belief which, without more, is insufficient to meet her burden of proving privilege. For the foregoing reasons, Warley's motion for relief from the government's alleged violation of her attorney-client privilege [docket item 682] is denied.

SO ORDERED.

Dated:     December 4, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[33] Warley's affidavit states that her belief that the outside attorneys represented her personally with respect to the communications at issue here "was consistent with" her experience in the previous litigations. Warley Decl. ¶ 3. Noting such a consistency, however, is very different from asserting reliance on the prior experiences, which Warley does not do.